IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| QUINAULT INDIAN NATION, FRIENDS OF GRAYS HARBOR, SIERRA CLUB, GRAYS HARBOR AUDUBON, and CITIZENS FOR A CLEAN HARBOR, | No. 45887-0-II Consolidated with Nos. 45947-7-II and 45957-4-II |
| Petitioners/Cross-Respondents, | |
| v. | |
| IMPERIUM TERMINAL SERVICES, LLC, | PUBLISHED OPINION |
| Respondent/Cross-Petitioner, | |
| CITY OF HOQUIAM, WASHINGTON STATE DEPARTMENT OF ECOLOGY, WESTWAY TERMINAL COMPANY, LLC, and WASHINGTON SHORELINES HEARINGS BOARD, | |
| Respondents. | |

JOHANSON, C.J. — The Quinault Indian Nation, Friends of Grays Harbor, Grays Harbor

Audubon Society, Sierra Club, and Citizens for a Clean Harbor (collectively Quinault) appealed

the Shoreline Hearings Board's (Board) grant of summary judgment on certain issues to Westway

Terminal Company LLC, Imperium Terminal Services LLC, the Department of Ecology (DOE),

and the City of Hoquiam (City). Quinault argues that (1) RCW 88.40.025 requires that Westway

and Imperium demonstrate financial responsibility at the State Environmental Policy Act (SEPA)[1] threshold determination phase and before permitting, and (2) the Ocean Resources Management Act (ORMA)[2] applies to Westway's and Imperium's terminal development projects. We reject Quinault's arguments and hold that (1) RCW 88.40.025 does not require permit applicants to demonstrate financial responsibility prior to permitting, and (2) ORMA does not apply to the Westway or the Imperium terminal development projects.

Imperium cross petitions and argues that the Board erred when it invalidated the DOE's and the City's SEPA threshold determinations because they did not consider the cumulative impact of U.S. Development Group LLC's (USD) similar terminal development project. We conclude this issue is moot because the DOE's and the City's mitigated determinations of nonsignificance (MDNS) were withdrawn, the parties have agreed to a determination of significance (DS), an environmental impact statement (EIS) will be prepared, and the continuing and substantial public interest exception to the mootness doctrine does not apply. We affirm the Board's grant of summary judgment.

---

[1] Ch. 43.21C RCW.

[2] Ch. 43.143 RCW.

FACTS

I. SUBSTANTIVE FACTS

A. THE WESTWAY AND IMPERIUM TERMINAL PROJECTS

Westway owns a terminal for storing methanol in the Port of Grays Harbor (Port) in Hoquiam. The Westway facility currently includes four 3.34 million gallon storage tanks, two rail spurs with 18 loading and unloading points, pipelines, and office and warehouse buildings.

On November 30, 2012, Westway applied for a substantial shoreline development permit (SSDP) based on plans to expand its operations. The purpose of the expansion was "to allow for the receipt of crude oil unit trains, storage of crude oil from these trains and shipment of crude oil by vessel and/or barge from the Port." Administrative Record (AR) at 73. The project involved adding four new storage tanks each with a capacity to hold 200,000 barrels of crude oil. Westway would have expanded the adjoining rail facility by lengthening the existing rail spurs and adding two additional spurs. Westway estimated that the expanded rail facility will receive 9.6 million barrels of crude oil per year—approximately equivalent to one 120-railcar train every three days.

Imperium operates a similar facility adjacent to the Westway terminal that is currently permitted for storage of biodiesel, methanol, and other products. In February 2013, Imperium applied for an SSDP for an expansion similar to Westway's expansion.[3] Imperium proposed nine new storage tanks with a total capacity of 720,000 barrels. Imperium also proposed to construct a "berm" large enough to contain the contents of the largest tank plus rainwater, to add 6,100 feet of

---

[3] We refer to the Imperium and Westway SSDPs collectively as "the permits."

railroad track and new rail spurs, and to expand the rail yard. Imperium would also have constructed pipelines to connect the Port terminal to the new storage tanks.

## B. SEPA REVIEW

Under the Shoreline Management Act of 1971 (SMA),[4] Westway's and Imperium's proposals must comply with SEPA and both Westway and Imperium submitted SEPA environmental checklists with their permit applications. Working together as "Co-leads," DOE and the City were charged with making a SEPA threshold determination of either nonsignificance (DNS), DS, or MDNS on both the Westway and the Imperium proposals.

In April and May, 2013, the Co-leads issued an MDNS for both the Westway and Imperium proposals.[5] As one of the mitigation measures, the MDNS required Westway and Imperium to submit oil spill prevention plans "required by . . . WAC 173-180." AR at 779, 234.

Before making their determinations, the Co-leads considered Westway's and Imperium's SEPA checklists, held telephone and in-person meetings with Westway and Imperium personnel, and reviewed additional information. The Co-leads, however, did not consider the cumulative impact of USD's similar terminal development proposal because USD "had not submitted an environmental checklist or permit application" and their proposal was still in its "conceptual stage." AR at 1522. USD's plans involved construction of new storage tanks with a 1.1 million-barrel storage capacity and receiving about five vessels per month.

---

[4] Ch. 90.58 RCW.

[5] The Co-leads issued the original Westway MDNS on March 14, 2013, but due to multiple requests to extend the comment period, issued the final MDNS on April 4.

## II. PROCEDURAL FACTS

After the Co-leads issued the MDNS for both projects, the City issued permits to Westway and Imperium. Quinault appealed the permits and the MDNS to the Board.[6] Quinault argued, in relevant part, that (1) the MDNS were invalid because the Co-leads "failed to adequately consider the direct, indirect, and cumulative impacts of three proposed crude-by-rail terminals in Grays Harbor," (2) the MDNS and permits were invalid because they failed to require demonstrations of financial responsibility under RCW 88.40.025, and (3) the MDNS and permits were invalid because "responsible official[s]" failed to consider ORMA. AR at 211.

Quinault, Friends of Grays Harbor, the Co-leads, the City, Westway, and Imperium each moved for summary judgment. The Board invalidated the MDNS and remanded the permits to the City and to the Co-leads for further SEPA analysis. The Board agreed with the Co-leads, Westway, and Imperium that (1) ORMA does not apply to the Westway and Imperium projects and (2) Westway and Imperium need not demonstrate financial responsibility until they file their oil spill prevention plans. But the Board agreed with Quinault on the cumulative impact issue and concluded that the MDNS were clearly erroneous because the Co-leads failed to consider the cumulative impact of USD's proposal.

Following the Board's decision, the Co-leads withdrew the MDNS and the permits, Westway and Imperium agreed to a DS, and the Co-leads began to prepare an EIS. Quinault and

---

[6] Quinault, Friends of Grays Harbor, and several other environmental groups—separately appealed the MDNS and permits to the Board. The Board consolidated their appeals and they submitted one brief to this court.

Consol. Nos. 45887-0-II / 45947-7-II / 45957-4-II

Imperium appeal the Board's order, petitioning for discretionary review by this court pursuant to RCW 34.05.518. We consolidated the appeals and granted review.

ANALYSIS

I. MOOTNESS

As a threshold matter, we determine (1) whether the Co-leads' failure to consider the cumulative impact of USD's proposal is moot, and (2) whether the Co-leads' failure to require a demonstration of financial responsibility at the permitting stage is moot. While we conclude both issues are moot, we address the financial responsibility issue under the continuing and substantial public interest exception.

A. STANDARD OF REVIEW AND RULES OF LAW

An issue is moot when we cannot provide the relief that the appealing party seeks. *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 350, 932 P.2d 158 (1997). There is an exception to the mootness doctrine when the issues "involve[ ] matters of continuing and substantial public interest." *Thomas v. Lehman*, 138 Wn. App. 618, 622, 158 P.3d 86 (2007). We apply a three-part test to determine whether an issue involves continuing and substantial public interest: "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination to provide future guidance to public officers, and (3) the likelihood that the question will recur." *Thomas*, 138 Wn. App. at 622.

B. THE CUMULATIVE IMPACTS ANALYSIS IS MOOT

Imperium argues that the Board erred when it invalidated the MDNS because the Co-leads failed to consider the cumulative environmental impact of the USD terminal proposal alongside the Westway and Imperium projects. The relief Imperium requests is that we reinstate the MDNS.

6

But the Co-leads have withdrawn the MDNS and made a new threshold DS with Westway's and Imperium's agreement. Because the Co-leads have voluntarily withdrawn the challenged MDNS and made a new DS with the permit applicants' agreement and the DS has not been appealed, we cannot grant the relief Imperium requests and the issue is moot.

Nonetheless, we must determine whether the continuing and substantial public interest exception to the mootness doctrine applies. First, this issue is of a public nature as it involves public natural resources and there is great public interest in the potential impact of these projects on those resources. Second, because consideration of cumulative impacts and specifically USD's proposal is fact specific, our holding here will not be helpful under a different set of facts. Thus, an authoritative determination based on the facts presented here would not provide future guidance because of necessarily different future factual scenarios. Finally, although the issue of cumulative impacts is likely to recur, an analysis of cumulative impacts is fact specific, as just discussed, such that a decision here is unlikely to be helpful even if it recurs. Thus, we conclude that the continuing and substantial public interest exception to the mootness doctrine does not apply. We hold that this issue is moot.

C. THE FINANCIAL RESPONSIBILITY ISSUE IS OF CONTINUING AND SUBSTANTIAL PUBLIC INTEREST

Likewise, because the Co-leads withdrew the MDNS, Quinault's argument that a demonstration of financial responsibility is required before permitting and during the threshold determination phase is moot. We hold that although we cannot provide the relief that Quinault seeks, the continuing and substantial public interest exception to the mootness doctrine applies.

7

Quinault seeks to invalidate the MDNS and the permits. But as discussed above, the MDNS and the permits were voluntarily withdrawn and we cannot provide the relief that Quinault seeks.

But again, we must next consider whether the continuing and substantial public interest exception applies. The question of when an applicant must demonstrate financial responsibility under RCW 88.40.025 is of public interest because this case concerns the use of public natural resources, is relevant to a substantial portion of the Port's economic development plan, and the environmental and economic impacts of the projects have already been the subject of several public meetings. As this issue will be relevant to future threshold determinations, it is also desirable to have a decision resolving if, when, and in what circumstances a permit applicant must demonstrate financial responsibility. This will provide meaningful guidance to public officials in the future. Finally, it is likely that this question will recur both in the future and between these parties because even after the EIS is completed, a question will exist regarding whether Westway and Imperium must demonstrate financial responsibility prior to permit approval.

Accordingly, we conclude that the continuing and substantial public interest exception applies. Thus, we reach the merits of the question of when an applicant must demonstrate financial responsibility under RCW 88.40.025.

## II. DEMONSTRATING FINANCIAL RESPONSIBILITY

Quinault argues that the MDNS are clearly erroneous and the permits are invalid because they do not require Westway and Imperium to demonstrate financial responsibility for a possible oil spill during the SEPA threshold determination phase and before the City may issue permits. We affirm the Board and hold that RCW 88.40.025 requires Westway and Imperium to

demonstrate financial responsibility in their oil spill prevention plans prior to beginning operation but not during the threshold determination phase or before permits may be issued.

A. FINANCIAL RESPONSIBILITY UNDER CH. 88.40 RCW AND CH. 90.56 RCW

Chapter 88.40 RCW imposes certain requirements on "facilities" that "transfer[ ] oil in bulk to or from any vessel with an oil carrying capacity over two hundred fifty barrels or pipeline, that is used for producing, storing, handling, transferring, processing, or transporting oil in bulk." RCW 88.40.011(7)(a). Facilities that meet this definition must

> demonstrate financial responsibility in an amount determined by [DOE] as necessary to compensate the state and affected counties and cities for damages that might occur during a reasonable worst case spill of oil from that facility into the navigable waters of the state.

RCW 88.40.025. Evidence of financial responsibility "may be established by any one of, or a combination of . . . (1) [e]vidence of insurance; (2) surety bonds; (3) qualification as a self-insurer; or (4) other evidence of financial responsibility." RCW 88.40.030.

These facilities must also submit an oil spill prevention plan to DOE. Former RCW 90.56.200(1) (2000). The oil spill prevention plan requires the facilities to demonstrate compliance with other "financial responsibility requirements under federal and state law," such as the financial responsibility requirements in RCW 88.40.025. RCW 90.56.200(2)(a). If DOE does not approve a facility's oil spill prevention plan, that facility "must not continue oil storage, transfer, production, or other operations until a plan for that facility has been approved." WAC 173-180-650(6)(c).

9

### B. FINANCIAL ASSURANCES ARE NOT REQUIRED PRIOR TO PERMITTING

Here, both the Westway and Imperium proposals included the construction of "facilities" for transferring oil to vessels. The Westway project's objective was the construction of four new storage tanks that would each hold 200,000 barrels of crude oil. That crude oil would then be transferred from the storage tanks to vessels that would carry it to refineries. The Imperium project included the construction of storage tanks to hold up to 720,000 barrels of bulk liquids, including fuel oil and crude oil. The Imperium proposal also included the construction of a pipeline that would be used to store and to transfer oil and other bulk liquids from the new storage tanks to the Port terminal so that they could be loaded onto vessels. Therefore, both Westway and Imperium must demonstrate financial responsibility in a "worst case spill." RCW 88.40.025.

The facilities must also submit oil spill prevention plans under former RCW 90.56.200(1) and as mitigation measures pursuant to the Co-leads' MDNS. The oil spill prevention plans require Westway and Imperium to demonstrate compliance with "financial responsibility requirements under federal and state law." RCW 90.56.200(2)(a). However, neither proposal's MDNS provides a specific date by which Westway and Imperium must demonstrate financial responsibility. Instead, the MDNS both state that Westway and Imperium must submit their oil spill prevention plans "required by . . . WAC 173-180." AR at 779, 234. WAC 173-180-650(6)(c) provides that Westway and Imperium will not be permitted to operate if DOE has not approved their oil spill prevention plans. Therefore, the latest that Westway and Imperium may demonstrate financial responsibility under RCW 88.40.025 is when they submit their oil spill prevention plans and prior to operating. There is no requirement that Westway and Imperium demonstrate financial responsibility under RCW 88.40.025 during the threshold determination phase.

10

Nevertheless, Quinault claims that because the mitigation measures that the Co-leads required pursuant to the MDNS must be "'capable of being accomplished,'" they must actually be accomplished in the threshold determination phase. Br. of Pet'rs at 39-40 (quoting RCW 43.21C.060; WAC 197-11-660(1)(c)). Therefore, according to Quinault, because the mitigation measures here include oil spill prevention plans and oil spill prevention plans require a demonstration of financial responsibility, SEPA requires Westway and Imperium to actually make the demonstrations of financial responsibility during the threshold determination phase. However, Quinault's argument fails because (1) SEPA's plain text does not require that mitigating measures actually be accomplished during the threshold determination phase, and (2) SEPA's policy permits compliance with mitigation measures after permits are issued but before beginning operations.

First, SEPA requires that the mitigation measures only be "reasonable and capable of being accomplished." RCW 43.21C.060. Nowhere in SEPA's text nor its implementing regulations does it require that mitigation measures actually be accomplished before permits may be issued. The statutes and regulations that govern oil spill prevention plans likewise do not provide a date certain by which the plans must be completed and submitted. The plain text of the regulations does, however, require a completed, approved oil spill prevention plan before a facility may begin "oil storage, transfer, production, or other operations." WAC 173-180-650(6)(c). In the absence of statutory language to the contrary, we do not read into the law a requirement that mitigation measures must actually be completed during the threshold determination phase and prior to permitting.

Second, the policy behind SEPA environmental review seeks to balance competing interests. As we have held,

11

> The timing of environmental review has long vexed the application of SEPA to the iterative progression of land use approvals. On one hand, review too near the inception of the process can become a discarded hypothetical exercise as features of the proposal change and become more specific. On the other hand, our Supreme Court observed that "the risk of postponing environmental review is a dangerous incrementalism where the obligation to decide is postponed successively while project momentum builds."

*Lands Council v. Wash. State Parks Recreation Comm'n*, 176 Wn. App. 787, 803, 309 P.3d 734 (2013) (internal quotation marks omitted) (quoting *King County v. Boundary Review Bd.*, 122 Wn.2d 648, 664, 860 P.2d 1024 (1993)). SEPA rules require that "[t]he lead agency shall prepare its threshold determination and [EIS], if required, at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identified." WAC 197-11-055(2).

Taking these rules together, it is consistent with SEPA's policy that Westway and Imperium demonstrate financial responsibility for a possible oil spill before they begin operations but not at the threshold determination or permitting phases. This sequence of events permits an efficient but complete threshold determination and permitting process while allowing the Co-leads to continue to ensure compliance with the mitigation measures.

The statute and its implementing regulations are silent as to when a showing of financial responsibility must be made. Thus, we hold that it was not error for the Board to allow only a later demonstration of responsibility here. We do not hold that it would necessarily be error for the Co-leads to require an earlier showing of financial responsibility in a different case. Accordingly, we affirm the Board and hold that Westway and Imperium are not required to demonstrate financial responsibility either at the threshold determination phase or prior to permitting. Therefore, the MDNS were not clearly erroneous nor were the permits invalid on this basis.

12

### III.  THE OCEAN RESOURCES MANAGEMENT ACT

Quinault next argues that the MDNS and permits are invalid because the Co-leads did not review the potential impacts of the Westway and Imperium projects using ORMA criteria. Specifically, Quinault argues that transporting oil by ship is either an "ocean use" or a "transportation" use under the text of ORMA's implementing regulations and the purpose of the statute.  We disagree.

The Co-leads and Imperium contend that the Westway and Imperium projects are not "ocean uses" under ORMA, its implementing regulations, or the City's municipal code because the projects at issue here are "land based" and ORMA applies to "marine or ocean-based projects." The Co-leads and Imperium also argue that the Westway and Imperium projects are not "transportation" uses because the transportation in these projects originates on land and not on the ocean.

Westway argues that the text and legislative history of ORMA demonstrate that it does not apply to onshore projects that do not involve oil extraction or exploration in Washington's coastal waters.  Specifically, Westway argues that the legislature enacted ORMA to "impose restrictions on resource extraction" in Washington's oceans and both its implementing regulations and local shoreline management plans reflect that history.  Br. of Resp't Westway at 5.  We agree with the Co-leads and Imperium and hold that the Westway and Imperium projects are neither "ocean uses" nor "transportation" uses under ORMA.  Accordingly, we affirm the Board.  Because we conclude that ORMA does not apply to the Westway and Imperium projects, we do not address whether ORMA is limited to projects that involve oil extraction as Westway suggests.

A. STANDARD OF REVIEW AND RULES OF LAW

Whether ORMA applies presents a question of statutory interpretation. Statutory interpretation is a question of law that we review de novo. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 555, 14 P.3d 133 (2000). However, we give DOE's interpretation of the law considerable weight because ORMA is within its area of expertise and DOE is charged with administering ORMA. *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015).

Our primary purpose in statutory interpretation is to ascertain and carry out legislative intent. *Manary v. Anderson*, 176 Wn.2d 342, 350-51, 292 P.3d 96 (2013) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). We begin statutory interpretation by analyzing the statute's plain meaning. *Manary*, 176 Wn.2d at 352. Where the statute's meaning is "plain on its face," we give effect to that plain meaning and presume it is the legislature's intent. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9-10. *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 222, 308 P.3d 597 (2013). Plain meaning can be determined "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn, LLC*, 146 Wn.2d at 11. Where a statute is ambiguous, we consider legislative history and principles of statutory construction to discern legislative intent. *Stephenson v. Pleger*, 150 Wn. App. 658, 662, 208 P.3d 583 (2009) (citing *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 242-43, 88 P.3d 375 (2004)). Statutory language is ambiguous when it is "susceptible to more than one reasonable interpretation." *Stephenson*, 150 Wn. App. at 662.

The legislature enacted ORMA in 1989 in order to protect the natural resources in Washington's coastal waters. RCW 43.143.005. ORMA requires additional environmental review

criteria for "[u]ses or activities that require federal, state, or local government permits or other approvals and that will adversely impact renewable resources, marine life, fishing, aquaculture, recreation, navigation, air or water quality, or other existing ocean or coastal uses." RCW 43.143.030(2).

An "ocean use" is defined as

*activities or developments involving renewable and/or nonrenewable resources that occur on Washington's coastal waters* and includes their associated off shore, near shore, inland marine, shoreland, and upland facilities and the supply, service, and distribution activities, such as crew ships, circulating to and between the activities and developments. Ocean uses involving nonrenewable resources include such activities as extraction of oil, gas and minerals, energy production, disposal of waste products, and salvage. Ocean uses which generally involve sustainable use of renewable resources include commercial, recreational, and tribal fishing, aquaculture, recreation, shellfish harvesting, and pleasure craft activity.

WAC 173-26-360(3) (emphasis added); Hoquiam Municipal Code (HMC) 11.04.030(20).

## B. THE WESTWAY AND IMPERIUM PROPOSALS ARE NOT OCEAN USES

The plain language of ORMA's implementing regulations confirms that the Westway and Imperium proposals are not "ocean uses" under WAC 173-26-360(3) or the City municipal code.[7] "Ocean uses are activities or developments involving renewable and/or nonrenewable resources that occur on Washington's coastal waters." WAC 173-26-360(3). Westway's and Imperium's proposals both include the construction of new storage tanks and pipelines for crude oil and other bulk liquids and the expansion of the adjoining railroad facilities to receive the crude oil. This construction will all occur on land and will not occur "on Washington's coastal waters." WAC 173-26-360(3). Westway and Imperium both propose to load the crude oil and other bulk liquids

---

[7] Hoquiam Municipal Code defines "ocean uses" and "ocean transportation uses" identically to ORMA's implementing regulations. HMC 11.04.030(19)-(20); WAC 173-26-360(3), (12).

15

from the storage tanks onto vessels or barges that will be traveling in Washington's coastal waters. However, Westway and Imperium will not own or operate any of those vessels. The purpose of the Westway and Imperium projects is to receive crude oil from trains, put them into storage tanks, and to load the crude oil onto vessels. This is not an ocean use because it does not occur on Washington's coastal waters.[8]

The Westway and Imperium proposals are also not "associated off shore, near shore, [or] inland marine . . . facilities." WAC 173-26-360(3). This definition requires that there be a primary activity that occurs on Washington's coastal waters to which these projects could be "associated." As discussed above, there is no primary activity that occurs on Washington's coastal waters. As the Co-leads argue, "These projects are not marine or ocean-based projects with a land component. Instead, they are land-based projects that have associated with them some marine transportation" component. Br. of Resp'ts DOE and City at 25. Because there is no primary activity occurring on Washington's coastal waters, the Westway and Imperium projects are not an "ocean use" subject to ORMA.

C. THE WESTWAY AND IMPERIUM PROPOSALS ARE NOT TRANSPORTATION USES

Quinault argues that the Westway and Imperium projects are "transportation" uses because the "marine" transportation of the crude oil will begin in Washington's coastal waters at the new terminal sites. Imperium argues that Quinault's interpretation of the regulation defining

---

[8] All parties rely on WAC 173-26-360(3) for the definition of "ocean use." We note that this regulation limits "ocean use" to activities that occur *on ocean waters* and their associated facilities. But RCW 43.143.030(2) does not contain such limiting language; instead it refers broadly to activities that have *an adverse impact* on renewable resources, marine life, and other ocean uses. Because the parties have not challenged this regulation, we do not further address this discrepancy.

"transportation" uses is incorrect and would lead to absurd results. The Co-leads argue that a "transportation" use is not any use that involves transportation in Washington waters generally, but those uses that are only "incidental to an offshore ocean use."[9]  Br. of Resp'ts DOE and City at 27.  We hold that the Westway and Imperium projects are not transportation uses because the regulation limits "transportation" uses to uses that are incidental to an "ocean use" and, as discussed above, there is no "ocean use."  Further, the transportation of the crude oil and bulk liquids will originate on land at the extraction point and not in Washington's coastal waters.

"Transportation" uses include "[s]hipping, transferring between vessels, and offshore storage of oil and gas; transport of other goods and commodities; and offshore ports and airports" and are defined as "activities that originate or conclude in Washington's coastal waters or are transporting a nonrenewable resource extracted from the outer continental shelf off Washington." WAC 173-26-360(12).  Certain environmental impact review criteria must also be applied to "transportation activities that originate or conclude in Washington's coastal waters or are transporting a nonrenewable resource extracted from the outer continental shelf off Washington." WAC 173-26-360(12).  The only issue here is whether the Westway and Imperium projects involve "transportation activities that 'originate . . . in Washington's coastal waters.'"  Br. of Resp't Imperium at 23.

1. THE CO-LEADS' ARGUMENT

The Co-leads argue that the regulation defining a "transportation" use applies only to uses that are "incidental" to a separate ocean use.  We agree and hold that the Westway and Imperium

_____

[9] The parties agree that the proper interpretation of the definition of "ocean uses" and "transportation" uses under WAC 173.26.360(3) and (12) controls the outcome in this case.

terminal projects are not "transportation" uses under WAC 173-26-360(12) because ORMA review criteria apply to only transportation uses where there is an associated "ocean use."

DOE promulgated WAC 173-26-360 to implement ORMA, which required DOE to "develop guidelines and policies for the management of ocean uses." WAC 173-26-360(1). In furtherance of this purpose, the regulation defines "ocean uses," explains the review criteria that permitting agencies must apply to ocean uses, and further defines other activities to which ORMA review criteria may apply. WAC 173-26-360(3), (6), (8)-(12) (oil and gas uses, ocean mining, ocean disposal, and transportation). We give "great weight" to an agency's interpretation of its own regulations. *Puget Soundkeeper All. v. Pollution Control Hearings Bd.*, 2015 WL 4540664, at *3 (Wash. Ct. App. July 28, 2015); *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004). In this case, DOE's position is that a "transportation" use is only subject to ORMA review criteria when it is "incidental to an offshore ocean use." Br. of Resp'ts DOE and City at 27.

Here, based on the stated purpose of WAC 173-26-360(1)—the development of "guidelines and policies for the management of *ocean uses*"—transportation uses are not separate activities to which permitting agencies must apply ORMA review criteria. (Emphasis added.) Instead, as DOE and the City argue, where an "ocean use" exists, ORMA review criteria must also be applied to its "incidental" transportation uses and activities. Applying ORMA review criteria to a prospective "transportation" use will only further WAC 173-26-360's purpose when an incidental ocean use exists. In this case the Co-leads need not apply ORMA review criteria to the Westway and Imperium projects because, as we concluded above, no "ocean use" exists.

18

Despite this regulation's stated purpose, Quinault points to the ocean shipment of crude oil and other bulk liquids from the Westway and Imperium terminals to refineries as the transportation use at issue here, arguing that "[b]y covering activities that originate or conclude in Washington, ORMA captures transportation of oil and other goods that would be loaded or unloaded in Washington ports." Br. of Pet'rs at 31-32. This argument is unpersuasive for two reasons. First, it ignores WAC 173-26-360's purpose—developing guidelines and policies for the management of *ocean uses*. Instead of addressing the regulation's purpose, Quinault asks this court to apply the definition of a "transportation" use to the Westway and Imperium projects. Quinault's argument assumes that "transportation" uses are freestanding uses to which ORMA review criteria must be applied even in the absence of an "ocean use." However, the regulation's definition of "transportation" uses does not implicate the Westway and Imperium projects because, in our view, ORMA applies when only an ocean use exists.

Second, Quinault's interpretation of ORMA and WAC 173-26-360 gives no deference to DOE's interpretations of those relevant laws. We, however, give "great weight" to DOE's interpretation—that transportation uses are subject to only ORMA review criteria when incidental to an existing ocean use—because both the regulations and ORMA are within DOE's area of expertise. *Cornelius*, 182 Wn.2d at 585; *Port of Seattle*, 151 Wn.2d at 593. Accordingly, we conclude that DOE's interpretation is reasonable and hold that the Westway and Imperium terminal projects are not "transportation" uses under WAC 173-26-360(12) because ORMA review criteria applies to transportation uses that are incidental to only an ocean use.

2. IMPERIUM'S ARGUMENT

Imperium contends that its and Westway's projects do not involve transportation that originates in Washington's coastal waters because the transportation of crude oil will begin at its extraction point, out of state. We agree that based on a plain reading of WAC 173-26-360(12), the Westway and Imperium projects are not transportation uses because the transportation of the crude oil and other bulk liquids will begin out of state and not in Washington's coastal waters.

"Transportation" uses, are, in relevant part, "activities that originate or conclude in Washington's coastal waters." WAC 173-26-360(12). The Westway and Imperium projects are not "transportation" uses because the transportation of crude oil and bulk liquids will originate out of state where the liquids will be loaded onto trains and transported by rail. At the proposed terminals, the bulk liquids will be received, stored in tanks, and transferred to ships.

Quinault's argument that ORMA applies because the "marine transportation" of the crude oil and bulk liquids *does* originate in Washington's coastal waters is misguided because WAC 173-26-360's text makes no distinction between transportation generally and "marine" transportation. The transportation of the crude oil and bulk liquids at issue here will not originate at the Westway and Imperium terminals but out of state at their extraction point.

Additionally, Quinault's interpretation of the term "transportation" uses would yield unintended results, namely that most transportation from ports on Washington's coast could be subject to ORMA review criteria. Although there are limits to when ORMA should apply—where only permits are required and the proposal would "adversely impact renewable resources, marine life"—such an interpretation of "transportation" uses would create a large, new administrative burden where ORMA's statements of legislative policy and intent are focused, though not

exclusively, on resource exploration. RCW 43.143.030(2). *See, e.g.,* RCW 43.143.010(2) ("There shall be no leasing of Washington's tidal or submerged lands."); RCW 43.143.010(4) ("It is the policy of the state of Washington to actively encourage the conservation of liquid fossil fuels, and to explore available methods of encouraging such conservation."). Therefore, we hold that the Westway and Imperium projects are not "transportation" uses because the transportation of the crude oil and bulk liquids will not originate in Washington's coastal waters.

## IV. CONCLUSION

In conclusion, we hold that RCW 88.40.025 does not require permit applicants to demonstrate financial responsibility before permitting, and ORMA does not apply to the Westway or the Imperium terminal development projects because neither project involves an ocean or transportation use as they are defined under ORMA. Further, we decline to address Imperium's cross appeal because the issue is moot, and we reject Quinault's argument that ORMA applies to the Westway and Imperium terminal expansion proposals.

We affirm.

JOHANSON, C.J.

We concur:

MAXA, J.

SUTTON, J.

21