**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE  JAN 1 2 2017
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Jun 12, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| QUINAULT INDIAN NATION, FRIENDS OF GRAYS HARBOR, SIERRA CLUB, GRAYS HARBOR AUDUBON, and CITIZENS FOR A CLEAN HARBOR, ) ) ) ) ) | No. 92552-6 |
| Petitioners, ) ) | En Banc |
| v. ) ) ) | Filed   JAN 1 2 2017 |
| IMPERIUM TERMINAL SERVICES, LLC;) CITY OF HOQUIAM; WASHINGTON STATE DEPARTMENT OF ECOLOGY; WESTWAY TERMINAL COMPANY, LLC; and WASHINGTON SHORELINES HEARINGS BOARD, ) ) ) ) ) ) | |
| Respondents. ) ) | |

OWENS, J. — Two companies applied for permits to expand their oil terminals on the shores of Grays Harbor. The expansion would facilitate the storage of additional fuel products, which would arrive by train or truck and depart by ocean-bound ship. The issue here is whether the Ocean Resources Management Act

(ORMA), chapter 43.143 RCW, applies to these expansion projects.[1]  The Shoreline Hearings Board (Board) and the Court of Appeals held that ORMA does not apply to these projects based on limited definitions in the Department of Ecology's (DOE) ORMA implementation regulations.  We hold that this interpretation improperly restricts ORMA, which was enacted to broadly protect against the environmental dangers of oil and other fossil fuels.  The parties also contest whether these projects qualify as "ocean uses" or "transportation" under DOE's regulations.  We hold that these projects qualify as both ocean uses and transportation.  Finally, though not discussed by the parties or the Court of Appeals, these projects qualify as "coastal uses" under DOE's regulations.  Accordingly, we reverse the Court of Appeals and remand for further review under ORMA's provisions.

## FACTS

Westway Terminal Company LLC owns a terminal used for storing petroleum products in the Port of Grays Harbor within the city of Hoquiam.  Grays Harbor and the areas along the rail and ocean vessel route contain many environmentally sensitive areas including streams, rivers, wetlands, and migratory bird habitats.  Westway applied to the city of Hoquiam and DOE to expand its

---

[1] ORMA was originally passed in 1989 in the wake of the Nestucca and Exxon Valdez oil spills. When the legislature passed the law, it explicitly noted the danger that oil spills pose to the state's marine environment.  LAWS OF 1989, 1st Ex. Sess., ch. 2.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

existing bulk liquid storage terminal to allow for the receipt of oil trains, storage of crude oil from those trains, and outbound shipment of oil by vessel and barge. The crude oil would be shipped from the Port of Grays Harbor to regional refineries. Westway's expansion project is situated on the shores of both Grays Harbor and the Chehalis River in the city of Hoquiam. Construction of the proposed project will be at least 160 feet from the river.

Westway plans to expand its existing facility by constructing four aboveground storage tanks for storing crude oil. Each tank will have a capacity of 8.4 million gallons, meaning the entire Westway project will have a capacity of 33.6 million gallons. Westway also plans to expand its rail facility from two short rail spurs to four longer spurs with a total of 76 loading spots. Westway would also add a vapor combustion unit and a structural hose support system to accommodate loading tanker vessels with crude oil. Once complete, Westway's expanded terminal is estimated to receive 403.2 million gallons of oil per year. This is equivalent to two "unit train" transits (one loaded and one empty, with 120 railcars each) every three days. Westway's expansion is estimated to increase the amount of train traffic by up to 243 transits per year. Westway's expansion project is also estimated to increase ocean vessel traffic by up to 120 transits per year.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Imperium Terminal Services LLC operates a similar terminal facility next to Westway's in Grays Harbor, also adjacent to the Chehalis River. Like Westway, Imperium applied to expand its bulk liquid storage terminal to allow for the receipt, storage, and shipment of crude oil, biofuels, and other fuel products. This expanded facility "would be served by three independent modes of transportation: water, rail, and truck, each of which would provide pathways for inbound raw materials or outbound products." Admin. Record (AR) at 228, 524. Imperium's expansion would include construction of nine additional storage tanks, each with a storage capacity of 3.36 million gallons, for a total capacity of 30.24 million gallons. Approximately 6,100 feet of new track would be constructed to expand their current railyard. Two new pipes would also be constructed, connecting the tank farm with a preexisting shipping terminal. Finally, a marine vapor combustion unit would be installed in order to incinerate vapors displaced during vessel loading. The unit would overhang the harbor's waters.

Imperium estimated its expansion project would increase terminal operations up to two unit trains per day (one loaded and one empty), each consisting of 105 tank cars, and would result in up to 200 ships or barges a year. Combined, the Westway and Imperium expansion projects would increase vessel traffic by 520 transits per year and increase train traffic by 973 transits per year. This would be a

4

310 percent increase in vessel transits and a 133 percent increase in train transits per year through Grays Harbor.

In order to gain permission to begin these expansions, Westway and Imperium applied for substantial shoreline development permits (SSDPs). DOE and the city of Hoquiam worked as "co-leads," tasked with making a threshold determination of nonsignificance, determination of significance, or mitigated determination of nonsignificance (MDNS). The co-leads issued an MDNS to both Westway and Imperium for their proposals and issued SSDPs for both terminals in April and June 2013. Petitioners[2] appealed the permits and MDNS to the Board, arguing in part that DOE and the city of Hoquiam failed to consider both the State Environmental Policy Act (SEPA), chapter 43.21C RCW, and ORMA before issuing the MDNSs.

Petitioners and respondents[3] all filed motions for partial summary judgment. Petitioners claimed that respondents violated SEPA because they ignored the cumulative impact of their own projects, as well as the foreseeable additional impact of a third, similar project when assessing environmental impact at the "threshold determination stage." *Id.* at 1142-52. The Board granted petitioners'

---

[2] Petitioners are Quinault Indian Nation, Friends of Grays Harbor, Sierra Club, Grays Harbor Audubon, and Citizens for a Clean Harbor.

[3] Respondents are Imperium, the city of Hoquiam, DOE, Westway, and the Board.

motion for partial summary judgment, holding that respondents' failure to account for the cumulative impact of all three projects made the issuance of the MDNS clearly erroneous. Respondents have not challenged this finding before this court.[4]

However, the Board also granted respondents' motion for partial summary judgment, determining that ORMA was not applicable to the proposal. It reasoned that ORMA only applies to ocean-based projects because of the ORMA implementing regulation promulgated by DOE, WAC 173-26-360. Using the definitions from that regulation, it noted that ORMA was designed to regulate activities in the ocean, such as extraction of oil, gas, and minerals, and concluded that the proposed Westway terminal did not fall within the definition.

Petitioners appealed this summary judgment order to the Court of Appeals, which accepted direct review. *Quinault Indian Nation v. Imperium Terminal Servs., LLC,* 190 Wn. App. 696, 360 P.3d 949 (2015). The Court of Appeals affirmed the Board's grant of summary judgment. *Id.* at 700. It found that the Westway and Imperium proposals were not subject to ORMA because they are not "ocean uses" or "transportation uses" under WAC 173-26-360(3) and (12). *Id.* at

---

[4] Because this third project withdrew its plans for construction, the Court of Appeals determined the issue was moot. Respondents have not further challenged that determination. *Quinault Indian Nation v. Imperium Terminal Servs., LLC,* 190 Wn. App. 696, 703-04, 360 P.3d 949 (2015).

712-17. The court reasoned that respondents' projects were not "ocean uses" because the terminals did not constitute a "primary activity occurring on Washington's coastal waters." *Id.* at 713. The court did not directly address ORMA's plain language or whether the Board was required to apply it to respondents' proposals. The court instead noted that ORMA does not contain any definition of "ocean uses," noted further that neither party had "challenged this regulation," and declined to analyze the statute further. *Id.* at 713 n. 8.

Petitioners sought review by this court, which was granted. *Quinault Indian Nation v. City of Hoquiam,* 185 Wn.2d 1017, 369 P.3d 500 (2016). We now find that the Board and Court of Appeals erred when finding that ORMA does not apply to respondents' proposed projects.

## ISSUES

1. Do respondents' proposed projects trigger review under ORMA's statutory framework, RCW 43.143.030?

2. Do these proposed projects constitute "[o]cean uses" or "transportation" under WAC 173-26-360(3) and (12)?

3. Do these proposed projects constitute "coastal uses" under WAC 173-26-360(6)?

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds could reach only one conclusion from the evidence presented. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). We review grants of summary judgment de novo. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003).

The issue here is whether the Board properly granted summary judgment when it found that respondents' projects were not subject to review under ORMA. Interpreting ORMA is an issue of first impression for this court. We interpret statutes de novo, as a question of law. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). When interpreting statutes, our fundamental purpose is to ascertain and carry out the intent of the legislature. *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011). If a statute's meaning is plain on its face, "then the court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ANALYSIS

*1. Respondents' Proposed Facility Expansion Projects Trigger Review under ORMA's Statutory Framework, RCW 43.143.030*

The Shoreline Management Act of 1971 is an extensive regulatory scheme designed to help local governments manage development along shorelines. Ch. 90.58 RCW. ORMA is integrated within this framework. *See* RCW 90.58.195(2) (counties, cities, and towns with coastal waters must ensure that their shoreline master programs "conform with RCW 43.143.010 and 43.143.030 and with the department of ecology's ocean use guidelines"). The purpose of ORMA is "to articulate policies and establish guidelines for the exercise of state and local management authority over Washington's coastal waters, seabed, and shorelines." RCW 43.143.010(1).

*A. ORMA Is a Balancing Tool That Must Be Liberally Construed*

ORMA is a balancing tool intended to be used by local governments to weigh the commercial benefits of coastal development against the State's interest in protecting coastal habitats and conserving fossil fuels. In its findings section, the legislature identified the ecological importance of our state's coastal habitats: "Washington's coastal waters, seabed, and shorelines are among the most valuable and fragile of its natural resources." RCW 43.143.005(1). The legislature also emphasized the commercial utility of industries dependent on the ocean and

9

shoreline. RCW 43.143.005(2). While recognizing the importance of commercial uses, the legislature nonetheless signaled that commercial endeavors may be prohibited if they are potentially destructive to the environment. RCW 43.143.005(3) ("Washington's coastal waters, seabed, and shorelines are faced with conflicting use demands. Some uses may pose unacceptable environmental or social risks at certain times.").

The purpose of statutory interpretation is to give effect to the intent of the legislature. *Campbell & Gwinn*, 146 Wn.2d at 9. We have historically found that when passing laws that protect Washington's environmental interests, the legislature intended those laws to be broadly construed to achieve the statute's goals. *See, e.g., Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 212, 995 P.2d 63 (2000) (noting that SEPA requires an environmental impact analysis even if a party's primary motivation for such analysis is economic in nature); *Leschi Imp. Council v. Wash. State Highway Comm.*, 84 Wn.2d 271, 277, 525 P.2d 774 (1974) (plurality opinion) (noting SEPA's application to "broader questions of environmental impact"). ORMA is designed to address environmental threats to our coastal waters and specifically addresses the threats posed by increased expansion of the fossil fuel industry along the Pacific Coast. *See* RCW 43.143.010. The language of the statute indicates that the legislature intended it to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

combat current environmental dangers and to preemptively protect the coastline from future environmental risks. Because ORMA addresses broad concerns surrounding the environmental dangers of collecting and transporting oil near our shores, it requires a liberal construction.

*B. Under the Plain Language of the Statute, ORMA Applies to Respondents' Projects*

In this case, the Court of Appeals neglected to apply the plain language of the statute, skipping directly to the definition of "ocean use" in WAC 173-26-360(3). *Quinault*, 190 Wn. App at 711-12. In so doing, the Court of Appeals failed to consider the legislature's explicit direction as written in the statute. In relevant part, RCW 43.143.030 states:

> (1) When the state of Washington and local governments develop plans for the management, conservation, use, or development of natural resources in Washington's coastal waters, the policies in RCW 43.143.010 shall guide the decision-making process.
>
> (2) Uses or activities that require federal, state, or local government permits or other approvals and that will adversely impact renewable resources, marine life, fishing, aquaculture, recreation, navigation, air or water quality, or other existing ocean or coastal uses, may be permitted only if the criteria below are met or exceeded . . . .

The plain text of this statute includes respondents' terminal expansion projects. These shoreline management plans include "plans for the management, conservation, use, or development" of Washington's environment. RCW

11

43.143.030(1). Further, they make use of "natural resources in Washington's coastal waters" as defined in the statute. *Id.* Respondents' projects are designed to transfer tens of millions of gallons of petroleum products across the threshold of Washington's coast. The projects thus constitute "[u]ses or activities" that require government permits and may "adversely impact renewable resources, . . . navigation, . . . or other existing ocean or coastal uses" due to the dramatic increase in both ocean vessel and rail traffic. RCW 43.143.030(2).

Nonetheless, Westway argues that ORMA's review criteria are narrowly triggered by the "location and nature of the activity." Suppl. Br. of Resp't Westway at 4. Likewise, Imperium claims respondents' projects are activities *on* coastal waters rather than *in* the water itself. *See* Suppl. Br. of Resp't Imperium at 10-12. The city of Hoquiam and DOE make similar arguments, indicating that the statutory language of ORMA shows it applies only to projects that sit "in" coastal waters. Suppl. Br. of Resp'ts Hoquiam & DOE at 6-14. Thus, according to respondents, because the bulk of these projects are several feet adjacent to the coast, and because any additions would be made to already existing facilities in Grays Harbor, ORMA should not apply. These arguments construe the statute too narrowly.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The plain language of RCW 43.143.030(1) anticipates respondents' projects. To hold that the statute does not apply to a storage facility transferring oil products from land transport to sea transport because the project is not literally "in" the ocean would be an overly narrow reading of the text. As explained above, the terminal expansion projects involve vast quantities of petroleum products. They receive petroleum and other fuel products on trains or trucks, transfer the products to temporary holding tanks, and then pipe the products into waiting vessels for further transport. The pipes that these products flow through extend from the coast onto a terminal, a structure located in Grays Harbor. The pipes then deposit the products onto ocean-bound tankers moored to the terminal. Further, the proposals include adding new loading arms and a combustion system on an existing dock. Thus, though the projects themselves are not literally "in" Washington's coastal waters, they would pump petroleum *over* those coastal waters, transfer them into vessels floating *in* those coastal waters, and require additional transfer installations on a dock located *on* those coastal waters. As noted above, we must construe this statute liberally. Therefore, the transfer of these products into these vessels and the construction of additional facilities constitute "management, conservation, use, or development of natural resources in Washington's coastal waters." RCW 43.143.030(1).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

### C. Other ORMA Provisions Indicate That the Projects Require Review under the Statute

RCW 43.143.030(2) also supports applying ORMA to these projects. It indicates that uses that (1) require government permits and (2) will adversely impact renewable resources, navigation, or other existing "ocean or coastal uses" are subject to ORMA. Respondents' projects require several government permits before construction can commence. They pose a great risk of adversely impacting renewable resources with their increased threat of environmental harm. They may also adversely impact navigation or preexisting ocean or coastal uses in the area by creating a substantial increase in ocean vessel and rail transits and increased risk of oil spills on coastal waters and coastline. Because of this, the projects are subject to ORMA review.

The plain language of RCW 43.143.010(5) further enforces this interpretation. RCW 43.143.010 explicitly lays out the legislature's policy and intent when it passed ORMA. Several subsections indicate an intent to regulate and limit collection and use of fossil fuels off our shores. RCW 43.143.010(1)-(4). However, subsection (5) demonstrates that the legislature did not intend ORMA to be restricted to just these causes. In that subsection, the legislature notes that it was not its current intent to "include recreational uses or currently existing commercial uses involving fishing or other renewable marine or ocean resources

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

within the uses and activities [that require review as] set forth in RCW 43.143.030." RCW 43.143.010(5). However, this language leaves open the possibility that these other recreational and commercial uses could be covered in the future. By leaving this opening, the legislature indicated that it considered, and left available, the possibility of incorporating activities other than offshore drilling under ORMA. This signals the broad spectrum of activities the legislature intended the statute to cover. Because of this, RCW 43.143.010(5) indicates that the legislature did not intend to preclude respondent's projects from undergoing ORMA review.

The policy encapsulated in ORMA is to carefully review development projects that involve nonrenewable resources and pose a risk of damage to the environment in Washington's sensitive coastal waters. Respondents' projects clearly fall within that broad policy. The projects might pose a threat to the coastline because of the massive quantities of fuel transferred from land to sea and the risk of that fuel contaminating our environment.

Therefore, we find that the plain text of the statute expresses the intent that respondents' projects be reviewed pursuant to ORMA.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

### 2. Respondents' Proposed Facility Expansion Projects Qualify as "Ocean Uses" and "Transportation" under WAC 173-26-360(3) and (12)

Even if the statute were ambiguous, we could resolve the issue under DOE's promulgated rules. If a statute is ambiguous, an agency's promulgated rules help our interpretation because they "'fill in the gaps' where necessary to the effectuation of a general statutory scheme." *Hama Hama Co. v. Shorelines Hr'gs Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). We apply our normal rules of statutory construction to administrative rules and regulations. *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). This court further gives rules and regulations promulgated by administrative bodies a rational and sensible interpretation. *Id.* at 57. Here, DOE's own ocean management rules support the conclusion that ORMA applies to respondents' projects.

### A. Respondents' Projects Are "Ocean Uses"

DOE has established a set of ocean management rules that help determine when ORMA applies to particular projects and proposals. In these rules, DOE provides definitions for both "ocean uses" and "transportation." WAC 173-26-360(3), (12). The parties contest whether respondents' projects fall under either definition. We hold that these projects are contemplated under both definitions.

While we give agencies great deference to their interpretation of rules within their area of expertise, we may substitute our interpretation of the law for that of an

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

agency. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004). It is valid for an agency to "fill in the gaps" via statutory construction as long as the agency does not effectively amend the statute. *Hama Hama*, 85 Wn.2d at 448. In this case, DOE improperly contorted the statute when it reasoned that respondents' projects are not "ocean uses" or "transportation." The regulation defines "ocean uses" as

> activities or developments involving renewable and/or nonrenewable resources that occur on Washington's coastal waters and includes their associated off shore, near shore, inland marine, shoreland, and upland facilities and the supply, service, and distribution activities, such as crew ships, circulating to and between the activities and developments.

WAC 173-26-360(3). Here, respondents' construction projects are designed to increase petroleum storage and transportation through facilities built on the edge of Grays Harbor. Such projects are precisely "developments involving . . . nonrenewable resources that occur on Washington's coastal waters." *Id.* DOE's contrary interpretation incorrectly narrows the definition of "ocean uses," thereby improperly altering the intent of ORMA.

Likewise, the Court of Appeals' holding that the projects were not ocean uses was error. *Quinault Indian Nation*, 190 Wn. App. at 713. The terminals not only sit as close as 160 feet from the water, but they extend *over* the water. *See* AR at 124, 228 (pipelines would connect the tank farms and overhang the water to load

17

vessels in the port); *see also id.* at 757 (aerial picture of facilities indicating the same). Because these projects sit on the shores of Grays Harbor and overhang the water, we find that respondents' projects qualify as "[o]cean uses" pursuant to WAC 173-26-360(3). To conclude otherwise would permit DOE's interpretation of ORMA to effectively amend the statute by substantially narrowing its scope.

Both DOE and the city of Hoquiam argue that the definition of "ocean uses" does not apply to respondents' projects because these projects do not literally sit *on* Washington's coastal waters. As explained above, this argument misreads RCW 43.143.030, which states that uses involving nonrenewable resources on Washington coastal waters that require permits, and that will adversely impact navigation or other ocean or coastal uses, must first meet ORMA's review criteria. Further, DOE and the city's argument ignores DOE's own rule stating that local governments "may permit *ocean or coastal uses* and activities as a substantial development . . . *only if*" ORMA's criteria are met. WAC 173-26-360(6) (emphasis added). Accordingly, because these projects are developments that use nonrenewable resources and are situated on Washington's coast, we find that they qualify as "ocean uses."

## B. Respondents' Projects Are "Transportation"

Respondents' projects also constitute "transportation" under DOE's ocean management regulations. Under DOE's ocean management framework, "ocean transportation" includes

> such uses as: Shipping, transferring between vessels, and offshore storage of oil and gas; transport of other goods and commodities; and offshore ports and airports. The following guidelines address transportation activities that originate or conclude in Washington's coastal waters *or* are transporting a nonrenewable resource extracted from the outer continental shelf off Washington.

WAC 173-26-360(12) (emphasis added). In this case, an integral part of respondents' projects is loading petroleum products onto ocean vessels to be shipped to refineries. Neither party disputes this fact. This is clearly a transportation activity that "originate[s] or conclude[s]" in Washington's coastal waters. *Id.* The activity must originate or conclude in Washington's waters *or* include a nonrenewable resource from Washington's continental shelf; it need not do both. *Id.* However, the Court of Appeals held that the projects cannot be "transportation" because they are not "'ocean use[s].'" *Quinault Indian Nation*, 190 Wn. App. at 714.

We find instead that respondents' projects *are* "ocean uses" and thus also qualify as "transportation." Once built, these projects will result in an estimated 310 percent increase in vessel traffic through Grays Harbor annually. Indeed, the expanded facilities would be served by three separate modes of transportation:

19

water, rail, and truck. Therefore, respondents' terminals constitute "transportation" because they serve no other purpose than to facilitate and increase the movement of petroleum products across both the ocean via tanker ships and land via rail.

### 3. *Respondents' Proposed Facility Expansion Projects Are "Coastal Uses" under WAC 173-26-360(6)*

While the parties dispute whether the projects are "ocean uses" under the WAC, neither party has addressed whether the projects qualify as "coastal uses" under WAC 173-26-360(6). Though no party has discussed this provision in their briefing, we have the "inherent authority to consider issues not raised by the parties if necessary to reach a proper decision." *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988). Here, it is clear that the language of the regulation, if applied to respondents' proposals, would trigger ORMA review.

DOE's rules read in relevant part, "[l]ocal government and the department may permit *ocean or coastal uses* and activities as a substantial development, variance or conditional use *only if the criteria of RCW 43.143.030(2)* listed below are met. . . ." WAC 173-26-360(6) (emphasis added). "Coastal use" is not defined in DOE's ocean management rules, nor is it defined in ORMA. To determine the meaning of an undefined term, we may look to standard English dictionaries. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998). In

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

standard English, "coast" means "land immediately abutting the sea" and "coastal" means "of or relating to a coast" or "located on or near a coast." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 433 (2002). In this case, it makes common sense to conclude that the respondents' proposed terminal expansion projects on the shores of Grays Harbor constitute "coastal uses" pursuant to WAC 173-26-360(6). Based on the plain meaning of the text, DOE intended ORMA to be considered before permitting construction projects along Washington's shores or coasts. Therefore, we hold that the administrative rules clearly intended its development projects, both ocean and coastal, be reviewed under ORMA.

Respondents' argument that ORMA does not apply to their projects because they are not "ocean uses" ignores the fact that ORMA *does* apply to "coastal uses" under both the statutory and administrative frameworks. Both ORMA and DOE's promulgated rules for ocean management plainly include coastal uses. The Court of Appeals erred when finding that ORMA does not apply to respondents' projects because they are not "ocean uses." In doing this, the Court of Appeals reads "coastal use" out of the statute entirely. Even if one could find that these projects do not qualify as "ocean uses" under ORMA, respondents make no argument that their projects are not "coastal uses" under either the RCWs or WACs. Respondents cannot argue that their projects are not "ocean uses" and then ignore

their qualification as "coastal uses" simply to evade ORMA review. Indeed, the construction sites sit on the shores of Grays Harbor, as close as 160 feet from the Chehalis River. Because respondents' projects abut the waters of both Grays Harbor and the Chehalis River, these projects constitute "coastal uses" pursuant to WAC 173-26-360(6).

## CONCLUSION

The issue here is whether respondents' proposed expansion of fuel storage terminals on the shores of Grays Harbor require review under ORMA. We hold that they do.

First, the plain language of RCW 43.143.030 shows the legislature intended ORMA to apply in this case. The purpose of ORMA is to carefully review development projects that involve nonrenewable resources and pose a risk of damage to the environment in Washington's coastal waters. Because the entire purpose of respondents' projects is to store and transfer fuel from Washington's coast to Washington's waters, the projects fit squarely within ORMA's broad reach. Second, the proposed terminal expansion projects also qualify as "[o]cean uses" and "transportation" as defined in WAC 173-26-360(3) and (12). These projects will increase transportation of petroleum products over land and sea. To say they do not constitute ocean uses or transportation would be to improperly narrow the intent of

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the law.  Finally, although not addressed by the parties, respondents' proposed projects qualify as "coastal uses" under WAC 173-26-360(6).  A plain reading of the rule shows respondents' projects constitute coastal uses because they are facilities situated along the waters of Grays Harbor and involve using the coast to store and transport fossil fuel products.

Accordingly, we reverse the Court of Appeals and remand the case for further proceedings consistent with this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Owens, J.

WE CONCUR:

Madsen, J.

Johnson, J.

Fairhurst, J.

Stephens, J.

Wiggins, J.

González, J.

Gordon McCloud, J.

Yu, J.