

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE __JAN 1 6 2020__

CHIEF JUSTICE



This opinion was
filed for record
at 8am on Jan 16, 2020

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

ASSOCIATION OF WASHINGTON BUSINESS, INDUSTRIAL CUSTOMERS OF NORTHWEST UTILITIES, NORTHWEST FOOD PROCESSORS ASSOCIATION, NORTHWEST INDUSTRIAL GAS USERS, NORTHWEST PULP AND PAPER ASSOCIATION, WASHINGTON TRUCKING ASSOCIATIONS, WASHINGTON FARM BUREAU, and WESTERN STATES PETROLEUM ASSOCIATION,

                Respondent,

    v.

WASHINGTON STATE DEPARTMENT OF ECOLOGY,

                Appellant,

    and

WASHINGTON ENVIRONMENTAL COUNCIL, CLIMATE SOLUTIONS, and NATURAL RESOURCES DEFENSE COUNCIL,

                Appellant-Intervenors.

- - - - - - - - - - -

AVISTA CORPORATION, CASCADE NATURAL GAS CORPORATION, NORTHWEST NATURAL GAS COMPANY, and PUGET SOUND ENERGY, INC.,

                Respondents,

    v.

WASHINGTON STATE DEPARTMENT OF ECOLOGY,

                Appellant.

NO. 95885-8

EN BANC

Filed     JAN 1 6 2020

STEPHENS, C.J.—This case concerns a novel rule promulgated by the Department of Ecology to address the undeniable crisis of climate change. The issue is not whether man-made climate change is real—it is. *See generally* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, GLOBAL WARMING OF 1.5° C (2019) [https://perma.cc/W2LS-DJQL]. Nor is the issue whether dramatic steps are needed to curb the worst effects of climate change—they are. *Id.* Instead, this case asks whether the Washington Clean Air Act (Act), ch. 70.94 RCW, grants Ecology the broad authority to establish and enforce greenhouse gas emission standards for businesses and utilities that do not directly emit greenhouse gases, but whose products ultimately do. Ecology claimed and exercised such authority in promulgating the challenged clean air rule (Rule), ch. 173-442 WAC.

Today we hold that by its plain language and structure, the Act limits the applicability of emission standards to actual emitters. Ecology's attempt to expand the scope of emission standards to regulate nonemitters therefore exceeds the regulatory authority granted by the legislature. We invalidate the Rule to the extent it exceeds Ecology's regulatory authority, while recognizing that Ecology may continue to enforce the Rule in its authorized applications to actual emitters. Accordingly, we affirm in part and reverse in part the trial court's decision and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

I.   The Legislature's Efforts To Reduce Air Pollution and Curb Greenhouse Gas Emissions

The legislature created the Act in 1967. LAWS OF 1967, ch. 238. Recognizing air pollution as "the most serious environmental threat in Washington state," the legislature significantly revised the Act in 1991 to better "preserve, protect, and enhance the air quality for current and future generations." LAWS OF 1991, ch. 199, §§ 101, 102; RCW 70.94.011. The legislature continued to revise and expand Washington's efforts to combat air pollution, recognizing increasing evidence of humanity's role in climate change.

In 2008, the legislature took its first direct step to combat climate change by enacting chapter 70.235 RCW, "Limiting Greenhouse Gas Emissions." That chapter established a timeline for specific emission reduction targets and directed Ecology to "submit a greenhouse gas reduction plan for review and approval to the legislature" by December 2008. RCW 70.235.020(1)(b). That same subsection encouraged Ecology to take swift action to address climate change, allowing "[a]ctions taken using existing statutory authority [to] proceed prior to approval of the greenhouse gas reduction plan." *Id.*

In the years following this enactment, the legislature's progress in addressing climate change stalled. In 2009 and 2015, the legislature declined to pass two major

bills designed to further regulate and reduce greenhouse gas emissions. *See* H.B. 1819, 61st Leg., Reg. Sess. (Wash. 2009); S.B. 5735, 61st Leg., Reg. Sess. (Wash. 2009); H.B. 1314, 64th Leg., Reg. Sess. (Wash. 2015); S.B. 5283, 64th Leg., Reg. Sess. (Wash. 2015). After the 2015 bill failed, Governor Jay Inslee directed Ecology to reexamine its existing statutory authority to curb greenhouse gas emissions by setting emission standards. In response, Ecology promulgated the Rule challenged here.

## II.    The Clean Air Rule

Relying on Ecology's authority under the Act, the Rule creates greenhouse gas emission standards for three types of businesses: (1) "[c]ertain stationary sources," (2) "[p]etroleum product producers and importers," and (3) "[n]atural gas distributors." WAC 173-442-010, -020(1)(k). The Rule requires most of these businesses to reduce their greenhouse gas emissions by 1.7 percent every year, using their emissions in 2017 as a baseline. WAC 173-442-060(1)(b).

The Rule gives covered businesses two nonexclusive options for reducing their greenhouse gas emissions. First, and most obviously, businesses can modify operations at their facilities to lower their actual emissions. WAC 173-442-200(4)(a). Second, covered businesses can acquire and submit "emission reduction units," which are accounting units representing the reduction of one metric ton of

carbon dioxide or its equivalent. WAC 173-442-020(1)(n), -200(4)(b). Covered businesses can obtain emission reduction units in three ways: (1) by reducing their actual greenhouse gas emissions below the reduction requirement for a given compliance period, (2) by undertaking recognized projects, programs, or activities that reduce emissions in real, specific, quantifiable, permanent, and verifiable ways, or (3) by purchasing emission reduction units in greenhouse gas emission markets outside of Washington. WAC 173-442-110. Once a business has obtained emission reduction units, it can either bank those units to save them for a later compliance period or exchange those units with other covered entities. WAC 173-442-130(1), -140.

Ecology projects that the Rule will reduce emissions by 20 million metric tons of carbon dioxide or its equivalent by 2035, or about two-thirds of the target established by the legislature in its 2008 enactment of chapter 70.235 RCW. As promulgated, the Rule covers approximately 68 percent of all the greenhouse gas emissions in Washington. Of those emissions covered by the Rule, approximately 74 percent are generated by the combustion of products sold by natural gas distributors and petroleum product producers and importers. Because these covered businesses sell products but "do not control the amount of fuel or gas burned," Ecology acknowledges these businesses "cannot make direct emissions reductions."

DEP'T OF ECOLOGY, PUB. NO. 16-02-014, CONCISE EXPLANATORY STATEMENT: CHAPTER 173-442 WAC, CLEAN AIR RULE; CHAPTER 173-441 WAC, REPORTING OF EMISSIONS OF GREENHOUSE GASES 273 (2016), https://fortress.wa.gov/ecy/ publications/documents/1602014.pdf [https://perma.cc/SA7Z-LFCA]. The emission reduction unit program therefore provides the sole mechanism through which natural gas distributors and petroleum product producers and importers can address the emissions generated by the products they sell. In other words, the Rule requires these businesses to pay to offset the emissions caused by third parties using their products.

III.   Procedural History

Soon after the Rule was promulgated in 2016, the Association of Washington Business joined with seven other industry trade organizations (collectively AWB) and filed a petition for review of the Rule under the Washington Administrative Procedure Act (WAPA), ch. 34.05 RCW.   Among other things, AWB argued Ecology lacked statutory authority under the Act to promulgate the Rule. Four utility companies that distribute natural gas throughout Washington also filed a petition for review. The two petitions were consolidated into a single challenge to the Rule. The trial court allowed the Washington Environmental Council and two other environmental organizations (collectively WEC) to intervene in defense of the Rule.

In late 2017, the trial court ruled that Ecology's "authority under [the Act] is limited to entities who introduce contaminants into the air, not entities who sell commodities." Clerk's Papers (CP) 756. In its subsequent written order, the trial court held that the Rule was invalid under the WAPA because "the Clean Air Rule exceeds the statutory authority of the agency conferred by law." *Id.* at 801 (Conclusion of Law 12). Without discussion, the trial court denied Ecology's request to sever the portions of the Rule that were held invalid. *Id.* at 787-88.

Ecology and WEC promptly filed notices of direct review with this court under RAP 4.2(a)(4). We granted review. We also granted the motion of the Puget Sound Clean Air Agency to file an amicus brief.

## ISSUES

(1)   Under the Act, may "emission standards" apply to businesses that do not directly emit greenhouse gases, but whose products ultimately do?

(2)   Is the Rule a valid exercise of Ecology's statutory authority?

(3)   Can the Rule be severed to strike only its invalid portions and allow those portions that apply to actual emitters to remain in effect?

## ANALYSIS

We review this challenge to the validity of Ecology's Rule de novo under the WAPA. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d

462 (2003); *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993) ("In reviewing administrative action, this court sits in the same position as the superior court, applying the standards of the WAPA directly to the record before the agency."). We will "declare the rule invalid only if . . . the rule exceeds the statutory authority of the agency." RCW 34.05.570(2)(c). "Administrative '[r]ules must be written within the framework and policy of the applicable statutes,' and so long as the rule is 'reasonably consistent with the controlling statute[s],' an agency does not exceed its statutory authority." *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 580, 311 P.3d 6 (2013) (alterations in original) (citation omitted) (quoting *Dep't of Labor & Indus. v. Gongyin*, 154 Wn.2d 38, 50, 109 P.3d 816 (2005); *Wash. Pub. Ports Ass'n*, 148 Wn.2d at 646). But "'[a]dministrative rules or regulations cannot amend or change legislative enactments.'" *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 19, 43 P.3d 4 (2002) (quoting *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 600, 957 P.2d 1241 (1998)). "[R]ules that are inconsistent with the statutes they implement are invalid." *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 715, 153 P.3d 846 (2007). And while "'we generally accord substantial deference to agency decisions, we do not defer to an agency the power to determine the scope of its own authority.'" *Lenander v. Dep't of Ret. Sys.*,

186 Wn.2d 393, 409, 377 P.3d 199 (2016) (quoting *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 540, 869 P.2d 1045 (1994)).

At the heart of this case is whether the plain meaning of the Act empowers Ecology to use emission standards to regulate businesses that do not emit greenhouse gases. Statutory interpretation presents a question of law we review de novo. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9. Our fundamental objective is to determine and carry out the legislature's intent. *Id.* When "the statute's meaning is plain on its face, [we] must give effect to that plain meaning." *Id.* To determine plain meaning, we consider "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* at 11. We also look to "the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole" to determine plain meaning. *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009).

Ecology argues it has authority to promulgate the Rule regulating nonemitters through emission standards under the Act generally, and under RCW 70.94.331(2)(c) and .030(12) in particular. *See* ch. 173-442 WAC (citing chapter 70.94 RCW as statutory authority). RCW 70.94.331(2)(c) outlines the "Powers and duties of the department." Among other things, this section directs Ecology to

> [a]dopt by rule air quality standards and emission standards for the control
> or prohibition of emissions to the outdoor atmosphere of radionuclides, dust,
> fumes, mist, smoke, other particulate matter, vapor, gas, odorous substances,

or any combination thereof. Such requirements may be based upon a system of classification by types of emissions or types of sources of emissions, or combinations thereof, which it determines most feasible for the purposes of this chapter.

*Id.* The Rule at issue here is an emission standard, which the Act defines as

a requirement established under the federal clean air act or this chapter that limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice, or operational standard adopted under the federal clean air act or this chapter.

RCW 70.94.030(12). Ecology argues the Rule is a valid exercise of its authority under the Act because it is a "requirement . . . that limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis" "based upon a system of classification by types of emissions." RCW 70.94.030(12), .331(2)(c).

Ecology is mistaken. While the Act does grant Ecology significant authority to regulate emissions in the manner it deems best, Ecology cannot exercise this authority outside the scope delineated by the legislature. RCW 34.05.570(2)(c).

I. The Plain Meaning of the Act Does Not Authorize Ecology To Regulate Entities That Do Not Directly Emit Greenhouse Gases

The plain meaning of the Act's "emission standards" definition limits the scope of Ecology's authority to promulgate emission standards to those entities that actually emit air pollutants. RCW 70.94.030(12). As a preliminary matter, we note that the "powers and duties of department" section of the Act cannot be read to

expand that definition to cover nonemitters. That section describes *how* emission standards can be organized—i.e., "based upon a system of classification by types of emissions or types of sources of emissions"—not *what* an emission standard is. RCW 70.94.331(2)(c). The crux of Ecology's argument is that because the Rule is based on a type of emission—namely, greenhouse gases—it can cover businesses that do not directly emit greenhouse gases, but whose products eventually do. But basing an emission standard on a type of emission does not mean Ecology can regulate any entity regardless of whether that entity is a source of emissions. Instead, the definition of "emission standard" plainly limits such rules to those entities that release air contaminants (i.e., sources of air contaminants). The text and the structure of the definition section—and that of the Act as a whole—directly undercut Ecology's claims to the contrary.

*A. The "Emission Standard" Definition Limits Its Scope to Actual Emitters*

An emission standard is "a requirement . . . that limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis." RCW 70.94.030(12). The Act defines "emission" as "a release of air contaminants into the ambient air." RCW 70.94.030(11). Taking these definitions together, an emission standard is best understood as a limit on how and when regulated entities can release air contaminants into the ambient air. If an emission standard regulates

-11-

the release of air contaminants, it naturally follows that emission standards are intended to regulate those entities that directly cause such releases.

Another indication that emission standards are meant to regulate only actual emitters is the fact that the definition in RCW 70.94.030(12) applies to both "emission standard" and "emission limitation," and the Act uses the term "emission limitation" exclusively in reference to direct sources of emissions. *See* RCW 70.94.030(6) ("'Best available control technology' (BACT) means *an emission limitation* based on the maximum degree of reduction for each air pollutant . . . *emitted from or that results from any new or modified stationary source.*" (emphasis added)), (7) ("'Best available retrofit technology' (BART) means an *emission limitation* based on the degree of reduction achievable through the application of the best system of continuous emission reduction for each pollutant that is *emitted by an existing stationary facility.*" (emphasis added), (14)(a) ("'Lowest achievable emission rate' (LAER) means for any source that rate of emissions that reflects . . . [*t*]*he most stringent emission limitation . . . for such class or category of source.*") (emphasis added). Because "emission standard" is synonymous with "emission limitation," emission standard cannot reasonably be interpreted more broadly than emission limitation. The fact that the term emission limitation is used exclusively

in reference to direct sources of emissions strongly suggests that the related term emission standard also applies only to direct sources of emissions.

Finally, the grammatical structure of the emission standard definition does not support Ecology's interpretation. RCW 70.94.030(12) provides both a primary definition of emission standard—"a requirement . . . that limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis"—and a couple of examples to illustrate that definition. Ecology argues that by holding emission standards apply only to sources that directly emit contaminants into the air, the trial court "g[ave] effect to only one clause in the definition" and ignored the importance of examples that could be read to apply to nonemitters. Br. of Appellant Wash. State Dep't of Ecology (Br. of Appellant) at 16.

But an example illustrating a definition should not be read to expand that definition. A "requirement [to] . . . limit[] . . . emissions of air contaminants" is just what it says: a rule requiring covered entities to limit their emissions. RCW 70.94.030(12). At times Ecology appears to understand the provision this way, as it describes the applicability of the Rule in terms of emission limits. WAC 173-442-030(1) ("Emission reduction requirements apply to a covered party when their . . . covered [greenhouse gas] emissions are greater than or equal to the compliance threshold."). The definition's inclusion of some examples that *could conceivably*

apply to nonemitters does not prove the legislature intended the Act to authorize Ecology to regulate more than direct emissions. Our task is to determine what the legislature intended by this provision—namely, the scope of the authority the legislature intended to grant Ecology. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9. We do not defer to agency interpretations of their own authority because their interpretation *could* have been what the legislature intended. *Lenander*, 186 Wn.2d at 409. At best, the definition is ambiguous in light of the examples. But the broadest possible interpretation of a provision is not a necessary consequence of any ambiguity, particularly where the evidence weighs heavily against such an interpretation.

> B. *The Text and the Structure of the Act as a Whole Suggest the Legislature Intended Emission Standards To Regulate Emitters*

To bolster its argument that the Act allows for a regulation that imposes emission standards on nonemitters, Ecology points to portions of the Act's purpose section. Ecology correctly notes the Act's purposes include "provid[ing] for the use of all known, available, and reasonable methods to reduce, prevent, and control air pollution," as well as "achiev[ing] significant reductions in emissions from those small sources whose aggregate emissions constitute a significant contribution to air pollution." RCW 70.94.011. Read in isolation, these clauses might suggest the legislature intended to imbue Ecology with wide-ranging authority to reduce air

pollution in any way possible. But a closer look at the Act's purpose statement undercuts this reading: "It is the policy of the state that the costs of protecting the air resource and operating state and local air pollution control programs shall be shared as equitably as possible *among all sources whose emissions cause air pollution.*" RCW 70.94.011 (emphasis added). By reading the Act's purpose statement selectively, Ecology justifies imposing significant costs on entities that do not emit pollutants into the air, in direct contravention of another provision of the same purpose statement.

Worse, Ecology attempts to use the purpose statement to justify an expansion of the Act's scope that is otherwise unsupported by the statutory text. At oral argument, Ecology suggested that the only limit on its rule-making reach is the practical ability to measure and assess indirect impacts.[1] But the Act's direction to

---

[1] *See* Wash. Supreme Court oral argument, *Ass'n of Wash. Bus. v. Dep't of Ecology*, No. 95885-8 (Mar. 19, 2019), at 4 min., 10 sec. through 8 min., 25 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2019031166 (responding to questions from Justice Sheryl Gordon McCloud and Justice Susan Owens, the State argued, "The limiting principle is within the definition of 'emission standard' itself . . . . 'Emission standard' has to limit the quantity, rate, or concentration of emissions, and so you have to know what the quantity of emissions are that you're dealing with . . . . For something in which it's not possible to quantify emissions, there may be other tools [besides emission standards] to address those greenhouse gas emissions. . . . [For example,] we know that there are greenhouse gas emissions associated with the gastric processes of livestock, and one of the answers to [the question why Ecology does not regulate livestock under the clean air rule] is we can't quantify livestock emissions with certainty. And if you don't have a quantity of emissions, there is nothing from which you can reduce those emissions.").

use "all known, available, and reasonable methods to reduce, prevent, and control air pollution" is not an invitation to regulate every entity whose activities may eventually contribute to quantifiable emissions. RCW 70.94.011. The plain meaning of "emission standard" in the Act applies only to actual emitters of air pollution. *See* RCW 70.94.030(12). Within that scope, the Act grants Ecology broad discretion to reduce emissions in whatever manner it thinks best. But outside of that scope, Ecology cannot act without further authorization from the legislature.

Nor can Ecology justify a need to use emission standards to solve every air pollution problem. Emission standards are only one tool the Act gives Ecology to regulate air pollution and to combat the accumulation of greenhouse gases in the atmosphere. Ecology is correct in claiming the legislature has vested the agency "with very broad authority and responsibility for managing this state's environment." *Weyerhaeuser Co. v. Dep't of Ecology*, 86 Wn.2d 310, 315, 545 P.2d 5 (1976). But Ecology's argument that this broad authority should allow it to expand the scope of one regulatory tool beyond what the legislature provided is mistaken. The legislature has not empowered Ecology to do whatever Ecology deems best for the environment. To the contrary, the legislature has provided Ecology with a variety of tools to fulfill its environmental responsibilities precisely because Ecology's responsibilities cover a wide range of environmental issues.

One such tool is an air quality standard: "'Air quality standard' means an established concentration . . . of an air contaminant or multiple contaminants in the ambient air which shall not be exceeded." RCW 70.94.030(3). As explained above, another tool is emission standards, which govern sources that directly emit air contaminants into the atmosphere. Emission standards serve a purpose separate and apart from the purpose of air quality standards. Emission standards govern what is emitted, while air quality standards govern permissible levels of a given air contaminant in the air as a whole.

The Act uses "air quality standard" and "emission standard" conjunctively, suggesting both should be brought to bear when Ecology promulgates rules to combat the effects of greenhouse gases. *See* RCW 70.94.331(2)(c) (directing Ecology to "[a]dopt by rule air quality standards *and* emission standards . . ." (emphasis added)). As we explained 30 years ago, "[b]y explicitly requiring [Ecology] to adopt separate standards for air quality and emissions," the legislature authorized Ecology power to create standards applicable to separate aspects of the air pollution problem: first, "an air quality standard sufficiently limiting the aggregate concentrations of contaminants," and second, "emission standards to control the release of contaminants from any individual source." *ASARCO, Inc. v.*

*Puget Sound Air Pollution Control Agency*, 112 Wn.2d 314, 320, 771 P.2d 335 (1989) (emphasis omitted).

Here, Ecology claims its Rule is an emission standard and an emission standard only. But rather than regulate identified sources of greenhouse gases—as an emission standard ought to do—the Rule attempts to curb the overall effect of greenhouse gases by "requir[ing] certain companies that sell, distribute, or import petroleum products and natural gas to . . . internalize some of the environmental costs associated with the products from which they profit." Br. of Appellant at 7. Forcing businesses to internalize the environmental costs of their customers' actions may indirectly help limit the aggregate concentrations of greenhouse gases in the atmosphere, but it does not actually regulate the release of those contaminants. In this way, the Rule creeps beyond the scope of an emission standard and into the realm of an air quality standard.

We need not decide today whether a Rule like the one challenged here would have been properly promulgated as an air quality standard, but we do decide that it is improper as an emission standard when applied to businesses that do not directly emit greenhouse gases. Where the legislature has provided multiple tools for Ecology to carry out its broad environmental mission, Ecology cannot credibly argue

the breadth of its mission supports expanding one tool beyond the authorized scope of the Act.

Taken as a whole, the Act's text and purposes do not provide the support Ecology claims for its broadly envisioned regulatory power. There may be other options open to Ecology, now or in the future, for addressing the impact of the petitioner businesses and utilities on climate change. But regulating them as so-called "indirect emitters" under the Act is not a statutorily authorized option. We therefore hold that the Rule exceeds Ecology's authority under the Act and is invalid to the extent it purports to regulate via emission standards businesses that do not directly emit greenhouse gases, but whose products ultimately do.[2]

A final consideration is whether the remaining provisions of the Rule survive without these invalid provisions. We conclude they do.

## II. The Unauthorized Aspects of the Rule Are Severable

Without discussion, the trial court rejected Ecology's request to invalidate only those aspects of the Rule that apply to natural gas distributors and petroleum product producers and importers. CP at 787-88. The Rule contains an express severability clause, WAC 173-442-370, and Ecology asks us to preserve those

---

[2] Because this holding grants AWB the relief it seeks, we decline to address AWB's alternative argument that the Rule's creation of emission reduction units exceeds Ecology's authority under the Act as to all covered entities.

portions of the rule, including its application to actual emitters, that reflect a valid exercise of its regulatory authority.

While we have not before addressed severability in the context of an administrative rule, we have recognized with regard to statutes that the presence of a severability clause "may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid," though it "is not necessarily dispositive on that question." *McGowan v. State*, 148 Wn.2d 278, 294-95, 60 P.3d 67 (2002) (citing *Gerberding v. Munro*, 134 Wn.2d 188, 197, 949 P.2d 1366 (1998); *Leonard v. City of Spokane*, 127 Wn.2d 194, 201, 897 P.2d 358 (1995)). We examine the challenged statute as a whole to determine whether the legislature could have intended to enact the valid sections alone and whether those valid sections alone work to achieve the legislature's goals. *Id.*

When evaluating the severability of regulations, the United States Supreme Court looks to similar questions of intent and workability. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294, 108 S. Ct. 1811, 100 L. Ed. 2d 313 (1988) (holding portion of regulation severable where the "severance and invalidation of this subsection will not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion"). The Court in *K Mart* functionally "applied the same test for the severability of statutes

that the Court had articulated in *Alaska Airlines*[, *Inc. v. Brock*, 480 U.S. 678, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987),] just one year earlier." Charles W. Tyler & E. Donald Elliot, *Administrative Severability Clauses*, 124 YALE L.J. 2286, 2296 (2015) (discussing the development of standards for determining severability of agency promulgated regulations).

Like the United States Supreme Court, we believe the test for the severability of regulations should be governed by the concepts of intent and workability that inform our test for the severability of statutes. To determine whether an invalid portion or aspect of a regulation is severable, we ask (1) whether the authorized and unauthorized portions of the regulation are so intertwined that the agency would not have believably promulgated one without the other and (2) whether the invalid portion is so intimately connected with the purpose of the regulation as to make the severed regulation useless to advance the purpose of the statute under which it is promulgated. Applying this test here, we conclude that the portions of the Rule applying to natural gas distributors and petroleum product producers and importers are severable from the remainder of the Rule, which will continue to advance the purpose of the Act even without these provisions.

First, Ecology argues it would have adopted a clean air rule creating an emission standard applicable only to direct emitters. As evidence, Ecology points

to its decision to include a severability clause in the Rule. *See* WAC 173-442-370. While persuasive, the existence of this clause is not dispositive. *McGowan*, 148 Wn.2d at 294-95 (citing *Leonard*, 127 Wn.2d at 201). The heart of Ecology's argument is that its intent in adopting the Rule was to reduce greenhouse gas emissions in Washington, which the Rule would accomplish with or without the portions regulating natural gas distributors and petroleum product producers and importers. *See* Br. of Appellant at 23. Ecology calculates that the Rule's benefits would outweigh its costs even if severed, suggesting Ecology would have had reason to adopt the valid portions of the Rule independent of the aspect we invalidate today.[3] CP at 681-84.

AWB counters that Ecology considered and rejected draft rules that would have covered only direct emitters, pointing to Ecology's reasoning that these narrower rules "would severely limit [Ecology's] ability to achieve the goals and

---

[3] The trial court declined to consider these calculations because they were not in the administrative record. CP at 785-86. Ecology points out that agencies may supplement the administrative record if new information relates to the validity of agency action and is needed to decide disputes around material facts that were not required to be determined on the agency record, RCW 34.05.562(1)(c), and that severability was not addressed in the agency record because the issue did not arise until after the final Rule was adopted. We agree that the declaration of Ecology's senior economist, in which Ecology's calculations regarding severability are described, falls within the meaning of RCW 34.05.562(1)(c), is appropriately considered as it relates to the validity of Ecology's rule making, and is needed to resolve whether Ecology would have promulgated the Rule without the provisions we invalidate today.

objectives of the authorizing statutes." DEP'T OF ECOLOGY, PUB. NO. 16-02-015, FINAL COST-BENEFIT AND LEAST-BURDENSOME ALTERNATIVE ANALYSIS: CHAPTER 173-442 WAC, CLEAN AIR RULE; CHAPTER 173-441 WAC, REPORTING OF EMISSIONS OF GREENHOUSE GASES 69 (2016), https://fortress.wa.gov/ecy/publications/documents/1602015.pdf [https://perma.cc/YNM6-2VGY]. The trial court seemed to agree, ruling that the provisions of the Rule purporting to regulate nonemitters were "fundamental to the entire Clean Air Rule" because the majority of projected emission reductions were expected to come through those provisions. CP at 801.

While AWB and the trial court are correct that most of the Rule's benefits were expected from the provisions we invalidate today, this does not show that the unauthorized provisions are so intertwined with the authorized provisions that Ecology would not have reasonably promulgated a rule without these provisions. To the contrary, the Rule regulates covered entities on an individual basis, and the unauthorized regulation of any particular nonemitter does not bear on the authorized regulation of any particular emitter. *See* WAC 173-442-050, -060, -070 (establishing individual emission baseline and reduction requirements for each covered entity). The Rule's structure is such that one does not depend on the other— the regulation of each entity is independent of any other. The fact that the narrowed

Rule may result in only a fraction of the emission reductions projected under the Rule as promulgated does not mean Ecology lacked justification for a rule that covered only direct emitters of greenhouse gases. We believe Ecology would have reasonably promulgated a clean air rule without the unauthorized provisions we invalidate today.

Second, Ecology argues that a severed version of the Rule would still advance the purpose of the Rule and the Act as a whole by requiring annual emission reductions from the state's 48 largest stationary sources of greenhouse gas emissions. We agree that regulation of these sources alone marks significant progress in Washington's efforts to curb greenhouse gas emissions and combat climate change. While the severed Rule would reduce emissions by a lesser amount than the Rule as promulgated, this reduction does not render the Rule useless. A less effective regulation can still advance the purpose of the statute under which it is promulgated, particularly where—as here—the unauthorized portions of the Rule can be severed without impact on the operation of the remainder of the Rule. *See* CP at 707-35.

Because Ecology would have reasonably promulgated a rule regulating only direct emitters of greenhouse gases and such a rule would still advance the purposes

of the Act, we hold that the unauthorized portions of the Rule are severable from its validly authorized provisions.

## CONCLUSION

By the Act's plain terms, emission standards are designed to limit the release of air contaminants by regulating direct emitters. The Act provides no authority for Ecology to use emission standards to regulate businesses and utilities that merely distribute products that generate greenhouse gases when they are combusted somewhere down the line. Left unchecked, Ecology's expansive interpretation of its own authority would sweep many newly branded "indirect emitters" into the regulatory web. We are confident that if the State of Washington wishes to expand the definition of emission standards to encompass "indirect emitters," the legislature will say so. In the meantime, Ecology may not claim more authority than the legislature has granted in the Act.

Accordingly, we affirm the trial court's ruling that the Rule exceeds Ecology's authority under the Act by purporting to regulate nonemitters through emission standards. But we modify the remedy granted by the trial court—instead of striking the Rule in toto, we invalidate the Rule only to the extent it regulates nonemitters via an emission standard. We remand to the trial court for further proceedings consistent with this opinion.

Stephens, C.J.

WE CONCUR:

Fairhurst, J.P.T.

Madsen, J.

González, McCloud, J.

No. 95885-8

OWENS, J. (dissenting) — This case asks us to determine whether the Department of Ecology (Department) possesses authority under the Washington Clean Air Act (Act), ch. 70.94 RCW, to promulgate the clean air rule (Rule), ch. 173-442 WAC. Specifically, we are asked to decide whether the Department may establish and enforce greenhouse gas emission standards as applied to natural gas distributors and petroleum product producers and importers, which sell products that generate greenhouse gases when combusted by end users. The plain meaning of RCW 70.94.030(12), defining "emission standard" and "emission limitation," unambiguously evinces that "emission standards" may apply to either or both direct or indirect emitters. And based on the Act's purpose and policies, the Rule was a proper exercise of authority to regulate and limit greenhouse emissions. Therefore, I respectfully dissent.

A challenge to the validity of an administrative rule is reviewed under the Administrative Procedure Act (APA). *See* RCW 34.05.510; *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003). A "court shall declare

the rule invalid only if it finds that . . . the rule exceeds the statutory authority of the

agency." RCW 34.05.570(2)(c). "The burden of demonstrating the invalidity of [an

agency rule] is on the party asserting [the] invalidity." RCW 34.05.570(1)(a). When

reviewing an administrative action, we sit in the same position as the trial court,

applying APA standards directly to the record. *Tapper v. Emp't Sec. Dep't*, 122

Wn.2d 397, 402, 858 P.2d 494 (1993). And most importantly, "when passing laws

that protect Washington's environmental interests, the legislature intended those laws

to be broadly construed to achieve the statute's goals." *Quinault Indian Nation v.*

*Imperium Terminal Servs., LLC*, 187 Wn.2d 460, 470, 387 P.3d 670 (2017).

In this case, the Department had the authority to promulgate chapter 173-442

WAC pursuant to RCW 70.94.331(2)(c) and .030(12). Specifically, the Act specifies

that the Department shall

> [a]dopt by rule air quality standards and emission standards for
> the control or prohibition of emissions to the outdoor atmosphere of
> radionuclides, dust, fumes, mist, smoke, other particulate matter, vapor,
> gas, odorous substances, or any combination thereof. Such requirements
> may be based upon a system of classification by types of emissions or
> *types of sources of emissions*, or combinations thereof, which it
> determines most feasible for the purposes of this chapter.

RCW 70.94.331(2)(c) (emphasis added). Furthermore, the Act's public policies and

purpose section states that "it is the purpose of this chapter to . . . provide for the use

of all known, available, and reasonable methods to reduce, prevent, and control air

pollution." RCW 70.94.011. The Act further identifies that

air emissions from thousands of small individual sources are major contributors to air pollution in many regions of the state. . . . It is declared to be the policy of the state to achieve significant reductions in emissions from those small sources whose aggregate emissions constitute a significant contribution to air pollution . . . .

*Id.*

Contrary to the expansive authority the Act provides to the Department, the majority concludes that the Department exceeded its authority in this case, and they reach this conclusion by analyzing the Act and the Rule through canons of statutory interpretation. However, the majority's analysis falls short of explaining how the Act limits the Department's regulatory authority to only direct emission sources. First, the majority recites RCW 70.94.030(12), which defines "emission standards" for purposes of the Act—"'a requirement . . . that limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis.'" Majority at 11. The majority then recites the definition of "emission," which is "'a release of air contaminants into the ambient air.'" *Id.*; RCW 70.94.030(11). The majority concludes by combining these definitions, since emission standards regulate air contaminants, "it naturally follows" that emission standards serve as regulations for entities that "directly cause such releases." Majority at 12.

This conclusion does not follow. At no point do these provisions state that only entities *directly* emitting air contaminants may be regulated under the Act. Rather, the plain language of RCW 70.94.030(12) reflects that "emission standards" need only be

a requirement that limits the concentration of emissions; it does not reflect that "emission standards" be a requirement that limits the concentration of emissions *from direct sources*. Arguably, the Act remains at most ambiguous as to whether it applies only to direct emitters or to both direct and indirect emitters, as the majority notes. *Id.* at 14. But while the majority is correct that "the broadest possible interpretation of a provision is not a necessary consequence of any ambiguity," *id.*, "[w]e have historically found that when passing laws that protect Washington's environmental interests, the legislature intended those laws to be *broadly construed* to achieve the statute's goals." *Quinault Indian Nation*, 187 Wn.2d at 470 (emphasis added). Therefore, since the Act's focus is to reduce emissions across the state from various sources, this potential ambiguity under the Act should be broadly construed to encompass both direct and indirect emission sources.

Furthermore, we may also discern such regulatory authority from the context in which the Act is found, from "related provisions, and [from] the statutory scheme as a whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). The Act's public policies and purpose section states that "it is the purpose of this chapter to . . . provide for the use of *all* known, available, and reasonable methods to reduce, prevent, and control air pollution." RCW 70.94.011 (emphasis added). The Act goes on to emphasize that the state's policy under the Act is to reduce emissions from "thousands of small individual sources." *Id.*

The Act makes clear that the legislature intended to imbue the Department with broad authority to reduce, prevent, and control air pollution, circumscribed by a familiar reasonableness standard. Regulating the producers and distributors of products that generate significant emissions when combusted by "thousands of small individual sources" is not only reasonable, *id.*, but doing so may well be the "most feasible" way to reduce emissions from myriad small sources. RCW 70.94.331(2)(c) (authorizing the Department to establish emission standards based on types of emissions or types of sources, or a combination, depending on what the Department determines "most feasible for the purposes of this chapter").

The majority also expresses concern that if this portion of the Rule is deemed valid, then there is no limiting principle with regard to the Department's ability to regulate companies that sell products that emit greenhouse gases. Majority at 25. However, the Department stated that there is such a limiting principle because the regulated emissions must be quantifiable so that they may be properly reduced. Wash. Supreme Court oral argument, *Ass'n of Wash. Bus. v. Dep't of Ecology*, No. 95885-8 (Mar. 19, 2019), at 4 min., 30 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. The majority states that this limiting principle unconstitutionally expands the Department's power beyond the scope of the Act. Majority at 15. But because the public policies and purpose section of the Act provides the Department with broad authority in reducing emissions, this

limiting principle is reasonable and well within the scope of the Act.

The legislature has authorized the Department to regulate both direct and indirect emitters. But the majority's conclusion not only improperly restricts the Department's authority to regulate indirect emitters but also contradicts the broad authority the legislature provided to the Department to reduce such emissions in our state. Because the Rule properly constitutes an emission standard as applied to natural gas distributors and petroleum product producers and importers, the Department did not exceed its statutory authority in promulgating the Rule, which should be held valid in whole. Therefore, I respectfully dissent and would reverse the trial court's ruling.

González, J.

Wiggins, J.

*Ass'n of Wash. Bus. v. Dep't of Ecology*, No. 95885-8

7